In the United States District Court
for the District of Kansas

———————

Case No. 24-cv-01139-TC

———————

ROULA HAMMOUD, ET AL.,

*Plaintiffs*

v.

MARCO RUBIO,[1]

*Defendant*

———————

## MEMORANDUM AND ORDER

Plaintiffs Roula Hammoud and Taha Matteo sued the United States Secretary of State, Marco Rubio, asserting that consular officers in Lebanon have unreasonably delayed making a final decision on their children's visa applications for admission into the United States. Doc. 1. Rubio moved to dismiss. Doc. 10. For the following reasons, his motion is granted.

## I

## A

A party may move to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1). There are, generally speaking, two ways to challenge subject-matter jurisdiction, one being facial and the other being factual. *Laufer v. Looper*, 22 F.4th 871, 875 (10th Cir. 2022). A facial challenge accepts the facts in the complaint as true but argues they fail to state a

---

[1] When suit was filed, Antony Blinken was the Secretary of State and the named defendant. Marco Rubio was sworn in as United States Secretary of State on January 21, 2025. In accordance with Rule 25(d)(1) of the Federal Rules of Civil Procedure, Rubio is substituted for the former Secretary of State, Antony Blinken, as the defendant. No further action is necessary.

1

basis for jurisdiction, while a factual attack contests the validity of jurisdictional facts. *Id.* Either way, "[t]he objection that a federal court lacks subject-matter jurisdiction … may be raised … at any stage in the litigation." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) (citing Fed. R. Civ. P. 12(b)(1) and 12(h)(3)). An objection to a plaintiff's standing is an objection that a federal court lacks subject-matter jurisdiction. *See Baker v. USD 229 Blue Valley*, 979 F.3d 866, 868 (10th Cir. 2020). Jurisdictional questions may be entwined with the merits of a case. If they are, then a court must convert a putative Rule 12(b)(1) motion into a Rule 12(b)(6) motion or a motion for summary judgment. *Kerr v. Polis*, 20 F.4th 686, 700 (10th Cir. 2021).

**B**

Plaintiffs Roula Hammoud and Taha Matteo brought this action under the Administrative Procedure Act, 5 U.S.C. §§ 551–559, seeking an order directing that a final decision be made on their children's visa applications. Doc. 1.[2] The facts of their case are straightforward, but a description of the legal context governing the relevant visa-application process will help contextualize the parties' dispute.

**1.** The Immigration and Nationality Act typically requires that a noncitizen seeking admission to the United States obtain a visa. 8 U.S.C. § 1181(a); *Dep't of State v. Muñoz*, 602 U.S. 899, 903 (2024). Visa decisions are left to the legislative and executive branches of the federal government. *Trump v. Hawaii*, 585 U.S. 667, 702–03 (2018). In particular, "Congress sets the terms for entry, and the Department of State implements those requirements at United States Embassies and consulates in foreign countries." *Muñoz*, 602 U.S. at 903.

Congress created a special application process for immediate relatives of U.S. citizens seeking admission to the country. *Kerry v. Din*, 576 U.S. 86, 89 (2015). This process first requires the citizen-relative to file a petition with U.S. Citizenship and Immigration Services asking to classify the noncitizen who is seeking admission as an immediate relative. *Muñoz*, 602 U.S. at 904. Immediate relatives include citizens' parents, spouses, and unmarried children under the age of 21. *Scialabba v. Cuellar de Osorio*, 573 U.S. 41, 46 (2014). A noncitizen whose petition is approved may then apply for a visa. *Muñoz*, 602 U.S. at 904. The visa-

---

[2] All references to the parties' briefs are to the page numbers assigned by CM/ECF.

application process entails submitting written materials and participating in an interview with a consular officer abroad. *Id.*

After the interview, the consular officer decides whether to issue or refuse the noncitizen's visa application. *See* 8 U.S.C. § 1201(g). A consular officer may not issue a visa to an applicant who does not meet the eligibility requirements set forth in the Immigration and Nationality Act and its corresponding regulations. *Kerry*, 576 U.S. at 89; 8 U.S.C. §§ 1201(a)(1) & (g); 22 C.F.R. § 41.121. For example, consular officers must refuse visa applications if the applicant has been convicted of certain crimes, 8 U.S.C. § 1182(a)(2), or if the applicant has engaged in terrorist activity, 8 U.S.C. § 1182(a)(3)(B). *See also Kerry*, 576 U.S. at 89; *Muñoz*, 602 U.S. at 905.

Sometimes consular officers must refuse visa applications for less evident reasons. Relevant here is when a consular officer refuses a visa application because further administrative processing is required to ensure that the applicant is eligible for admission into the country. 8 U.S.C. § 1201(g); *see, e.g.*, *Karimova v. Abate*, No. 23-5178, 2024 WL 3517852, at *2 (D.C. Cir. July 24, 2024) ("After a consular officer makes an official decision refusing to issue a visa because the applicant has not carried her burden of showing eligibility, the official may then conclude that the applicant could perhaps still receive a visa eventually if circumstances change."). The Foreign Affairs Manual, which provides guidance to consular officers making visa decisions, notes that an officer who has refused a visa application for further administrative processing may re-open and re-adjudicate the application, overcoming the initial refusal. 9 FAM 306.2-2(A)(a)(2)(a).

**2.** That legal background sets the stage for the visa-application process that applied to the plaintiffs' children in this case. In 2016, the plaintiffs—Roula Hammoud and Taha Matteo—got married in Lebanon. Doc. 1 at ¶ 11. At the time, Hammoud had two biological children, I.B. and L.B., who became Matteo's stepchildren. *Id.* at ¶¶ 2, 10. Matteo is a U.S. citizen, *id.* at ¶ 1, and in 2023, Hammoud became a citizen too, *id.* at ¶ 11. The married couple lives in Wichita, Kansas, along with a child that the pair had together. *Id.* at ¶ 26. The other two children, however, reside in Lebanon. *Id.* at ¶ 2. Their visa applications are the crux of this lawsuit.

In November 2020, Matteo started the process of obtaining visas for I.B. and L.B., who were fourteen and ten-years old, respectively. Doc. 1 at ¶ 12. Matteo first petitioned to classify I.B. and L.B. as his

immediate-relative stepchildren. *Id.*; 8 U.S.C. § 1151(b). The National Visa Center, which is part of the Department of State, approved Matteo's petitions and assigned case numbers for I.B. and L.B.'s visa applications. Doc. 1 at ¶¶ 15–17. The National Visa Center further determined that I.B. and L.B. had submitted the necessary documentation to qualify for a visa, so it scheduled an interview for the children, which took place in Lebanon in May 2023. *Id.* at ¶¶ 13, 18–20. According to the plaintiffs, the children's visa applications have been in "ongoing 'administrative processing'" since then. *Id.* at ¶ 27. The parties agree that the consular officers made the decision not to issue visas to I.B. and L.B. pursuant to 8 U.S.C. § 1201(g). Doc. 10 at 4; Doc. 12 at 2. That provision precludes officers from issuing a visa to an individual when, after the interview, there are still questions regarding the applicant's eligibility to enter the United States. 8 U.S.C. § 1201(g)(1). And the parties agree that the consular officers' decision that further administrative processing was warranted is characterized as a "refusal" of I.B. and L.B.'s visa applications, even though they dispute the legal significance of that characterization. Doc. 12 at 2; Doc. 13 at 1.

Matteo and Hammoud have sought answers from the consular office in Lebanon regarding the status of I.B. and L.B.'s visa applications. Doc. 1 at ¶ 23. They allege that their "attempts to resolve this matter have been either ignored or met with dismissive boilerplate responses." *Id.* And the plaintiffs further state that the processing delay has left them "in absolute despair." *Id.* at ¶ 28. Specifically, Hammoud has sought medical treatment due to the "tremendous stress and anguish" that she has experienced while separated from her children. *Id.* at ¶¶ 23, 27.

Based on the processing delay, Matteo and Hammoud sued the Secretary of State of the United States, who is currently Marco Rubio. Doc. 1. The plaintiffs assert two causes of action. One is a claim under the Administrative Procedure Act, 5 U.S.C. §§ 551–559, and the other is a request for a writ of mandamus. *Id.* at 7–8. Under both claims, Matteo and Hammoud request an order requiring Rubio "to issue a final decision on the visa applications of [I.B. and L.B.]." *Id.* at ¶ 54. Rubio moved to dismiss. Doc. 10. In particular, Rubio asserts that the plaintiffs lack standing because they have not alleged an injury that a judgment in their favor could meaningfully redress. *Id.* at 6. And, even if Matteo and Hammoud had standing, Rubio contends that the delay they describe was not unreasonable. *Id.* at 9–13.

## II

Matteo and Hammoud have not established that a judgment granting the relief they seek could meaningfully redress their injury—the alleged delay in resolving their children's visa applications. As a result, they do not have standing to pursue their claims.

### A

"Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting U.S. Const. art. III, § 2, cl. 1.); *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "For there to be a case or controversy under Article III, the plaintiff must have . . . standing." *TransUnion*, 594 U.S. at 423. "Regardless of the stage of litigation at which [federal courts evaluate] standing, the standing inquiry remains focused on whether the party invoking jurisdiction had a sufficient stake in the outcome when the suit was filed." *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1162 (10th Cir. 2023). Plaintiffs "must demonstrate standing separately for each form of relief sought." *WildEarth Guardians v. Pub/Serv. Co. of Colo.*, 690 F.3d 1174, 1182 (10th Cir. 2012) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Serv. (TOC), Inc.*, 528 U.S. 167, 185 (2000)) (internal quotation marks omitted).

Standing requires a plaintiff to have "suffered an injury in fact" that is "fairly traceable to the challenged action of the defendant" and is likely to be "redressed by a favorable decision." *Laufer v. Looper*, 22 F.4th 871, 876 (10th Cir. 2022) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "These requirements ensure that 'the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction.'" *Looper*, 22 F.4th at 876 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

The injury in fact must be "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up). For an injury to be concrete, it must be "real" rather than "abstract," but not necessarily "tangible." *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1190–91 (10th Cir. 2021). In other words, "it must actually exist." *Spokeo*, 578 U.S. at 340. And "[a] statutory violation does not necessarily establish injury in fact." *Looper*, 22 F.4th at 876 (explaining that *Spokeo* and *TransUnion* recently clarified that fact). "For an injury to be

particularized, it 'must affect the plaintiff in a personal and individual way.'" *Id.* (quoting *Lujan*, 504 U.S. at 560 n.1); *see also Spokeo*, 578 U.S. at 339. "[A]ctual or imminent [means] that the injury must have already occurred or be likely to occur soon." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). And "[a]n alleged future injury is sufficiently imminent 'if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" *Looper*, 22 F.4th at 876 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

As to causation, the plaintiff must show that "its injury is 'fairly traceable to the challenged action'" of the defendant. *Rocky Mountain Peace & Just. Ctr. v. U.S. Fish & Wildlife Serv.*, 40 F.4th 1133, 1152 (10th Cir. 2022) (quoting *Friends of the Earth*, 528 U.S. at 180). For Article III purposes, that means "proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005). To make that showing, "plaintiffs bear the burden of pleading and proving concrete facts showing that the defendant's *actual action* has caused the [harm or a] substantial risk of harm." *Rocky Mountain Peace & Just. Ctr.*, 40 F.4th at 1152 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)) (quotation marks omitted).

Regarding redressability, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Atlas Biologicals, Inc. v. Kutrubes*, 50 F.4th 1307, 1325 (10th Cir. 2022) (quoting *Lujan*, 504 U.S. at 560) (internal quotation marks omitted). In other words, "a party must show that a favorable court judgment is likely to relieve the party's injury." *WildEarth*, 690 F.3d at 1182 (quoting *City of Hugo v. Nichols (Two Cases)*, 656 F.3d 1251, 1264 (10th Cir. 2011)). "The plaintiff must show that a favorable judgment will relieve a discrete injury, although it need not relieve his or her every injury." *WildEarth*, 690 F.3d at 1182 (quoting *Nova Health Sys.*, 416 F.3d at 1158).

And finally, when assessing standing, federal courts are not to "open the door to merits considerations at the jurisdictional stage." *Smith v. Albany Cnty. Sch. Dist. No. 1 Bd. of Trs.*, 121 F.4th 1374, 1378 (10th Cir. 2024) (internal quotation marks omitted). Thus, "[f]or purposes of standing, [courts] must assume the Plaintiffs' claim has legal validity." *COPE v. Kan. State Bd. of Educ.*, 821 F.3d 1215, 1220 (10th Cir. 2016) (quoting *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1092–93 (10th Cir. 2006) (en banc)). In other words, "standing in no

6

way depends on the merits of the plaintiff's contention that particular conduct is illegal." *Warth v. Seldin*, 422 U.S. 490, 500 (1975).

### B

Matteo and Hammoud lack standing for two independent reasons. Neither the sole defendant in this case—Secretary of State, Marco Rubio—nor a federal court has the legal authority to adjudicate or order consular officers to determine a visa application that has been refused because further administrative processing was needed. As a result, the plaintiffs' alleged injuries resulting from the delay in administrative processing cannot be redressed by a judgment in their favor.

### 1

Rubio first argues that he cannot redress Matteo and Hammoud's injuries because he "lacks the authority to adjudicate visas, which lies in the exclusive province of consular officers." Doc. 10 at 6. Congress explicitly outlined the Secretary of State's role in granting and refusing visas in the Immigration and Nationality Act. *See* 8 U.S.C. § 1104(a). Specifically, it authorized the Secretary of State to administer and enforce immigration and nationality laws related to "the powers, duties, and functions of diplomatic and consular officers of the United States." *Id.* But there is a caveat: Congress expressly withheld from the Secretary of State's authority "those powers, duties, and functions conferred upon the consular officers relating to the granting or refusal of visas." *Id.* In other words, the statute affords consular officers "exclusive authority to review applications for visas, precluding even the Secretary of State from controlling their determinations." *Baan Rao Thai Rest. v. Pompeo*, 985 F.3d 1020, 1024 (D.C. Cir. 2021) (quoting *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1156 (D.C. Cir. 1999)).

Although the Secretary of State lacks authority to adjudicate the merits of a visa application, courts disagree on whether Congress authorized the Secretary of State to control the timing of visa determinations. *See Shamim v. Rubio*, No. 25-50016, 2025 WL 1399166, at *2 (N.D. Ill. May 14, 2025) (noting the split in authority). For example, some courts have found that a consular officer's exclusive control over the decision to grant, deny, or revoke a visa "is not the same as control over the *timing* by which the consular officer considers the applications presented to her." *Al-Gharawy v. U.S. Dep't of Homeland Sec.*, 617 F. Supp. 3d 1, 10–11 (D.D.C. July 27, 2022); *see also, e.g.*, *Salem v. Noem*, No. 24-11522, 2025 WL 1567864, at *4 (N.D. Ill. June 3, 2025).

According to those courts, Congress only withheld the Secretary of State's authority over the outcome of a visa application—not his control over a consular officer's pace in granting or denying visa applications. *Raouf v. U.S. Dep't of State*, 702 F. Supp. 3d 19, 28–30 (D.N.H. 2023). In contrast, some courts have held that the plain text of the Immigration and Nationality Act compels the opposite conclusion. *See, e.g.*, *Yaghoubnezhad v. Stufft*, 734 F. Supp. 3d 87, 97–98 (D.D.C. May 9, 2024). They reason that Congress, by withholding duties related to granting and refusing visas from the Secretary of State's authority, necessarily barred the Secretary of State from involving himself in *any* consular visa decisions—including the timing of those decisions. *See, e.g.*, *Shamim*, 2025 WL 1399166, at *2. As one court noted, the powers, duties, and functions related to granting and denying visas necessarily include "administrative guidance for the pace of visa adjudications and the completion of administrative processing." *Yaghoubnezhad*, 437 F. Supp. 3d at 98–99.

Neither the Supreme Court nor the Tenth Circuit has considered whether the Immigration and Nationality Act authorizes the Secretary of State to expedite or otherwise direct consular officers to make a visa determination within a reasonable time. It is therefore necessary to turn to principles of statutory interpretation to determine whether the Immigration and Nationality Act authorizes the Secretary of State to provide the relief the plaintiffs seek. The primary task in interpreting a federal statute is "to determine congressional intent." *Coffey v. Freeport McMoran Copper & Gold*, 581 F.3d 1240, 1245 (10th Cir. 2009). That inquiry "start[s] with the plain meaning of the text." *Wichita Ctr. for Graduate Med. Educ., Inc. v. United States*, 917 F.3d 1221, 1224 (10th Cir. 2019) (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). "If the statutory language is unambiguous and 'the statutory scheme is coherent and consistent' . . . '[t]he inquiry ceases.'" *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016) (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002)); *accord United States v. Sprenger*, 625 F.3d 1305, 1307 (10th Cir. 2010)). So, if a statute's terms are clear and unambiguous, the plain language of the statute controls. *United States v. Brown*, 529 F.3d 1260, 1265 (10th Cir. 2008); *see also* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012) ("[T]he purpose [of a statute] must be derived from the text, not from extrinsic sources such as legislative history or an assumption about the legal drafter's desires.").

Rubio's authority to require consular officers to adjudicate a visa application depends on whether the pace of a consular officer's visa determinations is a duty, task, or function that *relates to* granting and refusing visa applications. As the Supreme Court has noted, "Congress characteristically employs the phrase ['relate to'] to reach any subject that has 'a connection with, or reference to,' the topics the statute enumerates." *Coventry Health Care of Missouri, Inc. v. Nevils*, 581 U.S. 87, 95–96 (2017) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)); *see also Relate*, Webster's students dictionary (1962) (defining "relate to" as "[t]o bring into connection," "[t]o establish relationship between," "[t]o have relationship or connection," or "to belong"). Absent statutory language limiting the phrase "relates to," the plain meaning of the text suggests that it encompasses a broad range of conduct. *See Lamar, Archer & Cofrin, Llp v. Appling*, 584 U.S. 709, 717–18 (2018) (collecting Supreme Court cases interpreting the term "relating to" and noting that it has a broad ordinary meaning); *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139 (1990) (finding that a law "relates to" an employee benefit plan "even if the law is not specifically designed to affect such plans, or the effect is only indirect"). The administrative process a consular officer follows when he or she decides to grant or deny a visa, including the pace of that process, has a direct connection and relationship to the officer's visa determination itself. That means the Secretary of State cannot control it. 8 U.S.C. § 1104(a); A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 56–57 (2012) (noting that it is unnecessary to look beyond the text of a statute to determine its meaning where the text is unambiguous). As one court noted, the Act's plain language precludes the conclusion that the Secretary has any "residual authority to control the timing by which consular officers consider applications presented to them." *Yaghoubnezhad v. Stufft*, 734 F. Supp. 3d 87, 97–98 (D.D.C. 2024); *see also Givehchi v. Rubio*, No. 24-2343, 2025 WL 859841, at *3 (D. Kan. Mar. 19, 2025); *Calvary Albuquerque, Inc. v. Blinken*, 720 F. Supp. 3d 1138, 1167–68 (D.N.M. 2024), *aff'd sub nom. Calvary Albuquerque Inc. v. Rubio*, 136 F.4th 1217 (10th Cir. 2025), *vacated on denial of reh'g en banc*, 154 F.4th 1246 (10th Cir. 2025).

Hammoud and Matteo's response in opposition actually confirms this conclusion. That is because they do not confront Rubio's argument that he is the wrong defendant in light of Congress's decision to grant exclusive authority over duties related to granting and denying visas to consular officers—not the Secretary of State. Instead, they reassert their allegations as to why the consular officers in Lebanon have

unreasonably delayed a final determination on their children's visa applications. *See* Doc. 12 at 3–6. For example, they state that they have standing because "[t]he consular officer's failure to adjudicate the visa applications, and to hold the case in 'administrative processing' without any end in sight," unlawfully deprives them of their right to receive a final visa determination. *Id.* at 6. The plaintiffs' repeated assertions of why they believe the consular officers' actions have been unlawful do not meaningfully address why Rubio—the Secretary of State—has the authority to direct the consular officers in Lebanon to expedite their administrative processing of I.B. and L.B.'s visa applications. The plaintiffs only sued Rubio, and, as a result, they have not met their burden to establish standing. *See Rio Grande Found. v. City of Santa Fe*, 7 F.4th 956, 960–61 (10th Cir. 2021) (dismissing a case for lack of jurisdiction and emphasizing that the plaintiff had the burden to establish standing).

## 2

Even if Rubio were a proper defendant, he contends that the order the plaintiffs seek would not redress their injuries. Doc. 10 at 7–9. Invoking the Administrative Procedure Act (APA), 5 U.S.C. §§ 551–559, Hammoud and Matteo seek to order consular officers in Lebanon to "issue a final decision" on I.B. and L.B.'s visa applications, Doc. 1 at ¶ 54, or find that a final decision on their applications has been "inordinately delayed," *id.* at ¶ 55. Because the decision not to issue any final decision on a visa application is considered a "refusal," this relief would require the consular officers to complete the administrative processing of I.B. and L.B.'s visa applications, re-open their applications, and make a new determination as to whether to issue or refuse a visa. *See* 22 C.F.R. § 41.121(a) (noting that Section 1201(g) is a legal ground for refusal under the Immigration and Nationality Act); 9 Foreign Affairs Manual 504.11-4(A) (2022) ("You should find that an applicant has overcome a [visa refusal] . . . when the applicant has presented additional evidence, allowing you to re-open and re-adjudicate the case, or when the case required additional administrative processing, which has been completed."). The parties disagree on whether the APA authorizes federal courts to issue such relief—specifically, an order directing consular officers to complete administrative processing of a refused visa application, re-open the application, and then re-adjudicate it.

Individuals who have been harmed by agency action may bring a claim under the APA. 5 U.S.C. § 702; *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61–62 (2004). They can sue over inaction, too, if an agency

"unlawfully withheld or unreasonably delayed" its actions. 5 U.S.C. § 706(1); *Norton*, 542 U.S. at 61–62. But an APA claim alleging a failure to act under Section 706(1) may "proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take.*" *Id.* at 64 (emphasis in original).

Hammoud and Matteo have not identified a discrete action that consular officers are required to take. In particular, they have not pointed to any authority requiring consular officers to finish the administrative processing of a visa application and determine whether to overcome the applicant's initial refusal. They did not, for example, suggest that the Immigration and Nationality Act creates such a duty. And for good reason: Courts regularly hold that consular officers' duty to issue or deny a visa is fulfilled once the officers refuse the visa based on the need for additional administrative processing. *See, e.g., Jung v. Goldman*, No. 24-2500, 2025 WL 2687983, at *10 (D. Colo. Sep. 19, 2025) (collecting cases); *Yaghoubnezhad*, 734 F. Supp. 3d at 94 (quoting 9 Foreign Affairs Manual 302.1-8(B) (2023)) (noting that a refusal based on the consular officer's belief that the applicant may be ineligible based on the available information "is, legally, a refusal on a visa application, even if that refusal is eventually overcome"). True, the guidance that consular officers receive allows them to overcome the prior refusal by re-opening and re-adjudicating the visa. 9 Foreign Affairs Manual 302.1-8(B) (2023). But that is a discretionary decision. *Id.* Neither statutory nor regulatory guidance requires consular officers to re-open a refused visa application at all, let alone within a specified period of time. *Norton*, 542 U.S. at 65 (noting that only statutory and regulatory mandates justify a judicial decree compelling an agency to act within a certain time period).

The plaintiffs instead point to one of the APA's "Ancillary Provisions" to create such a duty. Doc. 1 at ¶ 31 (citing 5 U.S.C. § 555(b)). In other words, they seek to use a general APA process to create a specific enforceable duty under the Immigration and Nationality Act. Section 555(b) provides that "within a reasonable time, each agency shall proceed to conclude a matter presented to it." This is a "non-specific directive to all agencies" that "leaves officials ample room for judgment based on the circumstances." *Karimova v. Abate*, No. 23, 5178, 2024 WL 3517852, at *3 (D.C. Cir. July 24, 2024) (quoting 5 U.S.C. § 555(b)). Its general language, which applies to all agency action, does not support the conclusion that consular officers have a discrete duty to determine, within a certain period of time, whether to grant or refuse

a visa application that was already refused for further administrative processing. *See Hi-Tech Pharmacal Co., Inc. v. U.S. Food & Drug Admin*, 587 F. Supp. 2d 1, 9 (D.C. Cir. 2008) ("Section 555(b) is a far cry from the 'discrete agency action' that courts require when issuing an order compelling agency action 'unlawfully withheld or unreasonably delayed.'"). To hold otherwise would allow individuals to file suits under the APA for any delay in any agency's action, which would contradict the well-settled interpretation of the APA that "[f]ailures to act are sometimes remediable . . . but not always." *Norton*, 542 U.S. at 61. As a result, the order that Hammoud and Matteo seek cannot meaningfully redress their injuries, depriving them of standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 569 (1992) (concluding that the redressability requirement had not been met where "resolution by the District Court would not have remedied respondents' alleged injury" because it would not have been binding on the agencies); *California v. Texas*, 593 U.S. 659, 673 (2021) (explaining that an unenforceable injunction fails to fulfill the constitutional redressability requirements).

## III

For the foregoing reasons, Rubio's Motion to Dismiss, Doc. 10, is GRANTED.

It is so ordered.

Date: December 30, 2025          s/ Toby Crouse
                                 Toby Crouse
                                 United States District Judge